UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| JOSEPH D. WRIGHT,<br><br>                          Plaintiff,<br><br>          v.<br><br>ANDREW M. SAUL,<br>Commissioner of Social Security,<br><br>                          Defendant. | CAUSE NO. 2:20-CV-261 DRL |

OPINION & ORDER

Joseph D. Wright appeals from the Social Security Commissioner's final judgment denying disability and disability insurance benefits and requests remand for further consideration. Having reviewed the underlying record and the parties' arguments, the court grants Mr. Wright's request and remands the Commissioner's decision for further consideration consistent with this opinion.

BACKGROUND

Mr. Wright is a veteran diagnosed with bipolar disorder type I: manic-depressive with psychosis [R. 436]. Mr. Wright testified that he hears voices "daily" that constantly harass him and has since about 2011 [R. 54]. He needs to yell periodically as a mental release [R. 60]. Dr. George Paniotte, a VA psychiatrist, has treated Mr. Wright since 2011 [R. 58] and noted that Mr. Wright experiences tangential thought processes, difficulty focusing, challenged and impulsive judgement, hypomanic symptoms, and hypo-verbosity [R. 475]. Dr. Paniotte also found that Mr. Wright is prone to slip into psychotic manifestations, self-isolates, and has monotone speech that is stilted formal and devoid of emotion [R. 370, 475].¹ Mr. Wright has undergone multiple psychiatric hospitalizations (though none

---

¹ Mr. Wright's testimony reflects some of this psychological idiosyncrasy. For example, he testified that he "want[s] to transition or, perhaps, go to grad school later. I can't see my way through the cop torture or the head torture of the radio ahead or anything similar without being declared disabled in order to try to transition

in recent years) and attempted to commit suicide by stabbing himself during one manic episode [R. 475]. Mr. Wright has been on a myriad of psychiatric medications (with the dosages frequently changing); however, he isn't always compliant with taking his medication as directed [R. 396]. He lives with his parents, though they are fearful of him [R. 62]. Mr. Wright also lost a significant amount of money in recent years due to bad investments [R. 487, 494] but nevertheless wants to work and become independent despite past difficulties [R. 475].

Mr. Wright is an educated man. He has a bachelor's degree in finance from the University of Evanston, joined the army, and worked as a petroleum supply specialist while enlisted in 2004 [R. 228-29]. After leaving the army, he worked as a financial advisor and then consultant from 2006 to 2007 [*id.*] until being forced to resign following an altercation with a coworker in which he held a shotgun shell and warned "maybe I'll go hunting later" [R. 61]. Mr. Wright was unemployed from 2007 to 2017 (save for a one-day stint as a janitor) during which time his psychosis bloomed [R. 229]. He was briefly employed at a golf course in 2018 but left because the "medication ceased to work again" and his manic symptoms reemerged [R. 44-45]. Mr. Wright volunteers at a local park with his uncle [R. 47].

Mr. Wright previously received social security benefits. He was terminated from the program for uncertain reasons, perhaps including for refusing to see a new physician [R. 59]. The ALJ said his removal was due to an improvement of his condition [R. 21-22].

Mr. Wright filed a Title II application on December 1, 2017, alleging disability beginning on November 30, 2017 [R. 15]. The claim was denied initially and again on reconsideration [*id.*]. He appealed to the ALJ, who concluded that Mr. Wright had not engaged in substantial gainful activity during the relevant period, had a severe impairment of type I bipolar disorder [R. 17] and had minimal/non-severe impairments including a hammertoe and swelling in his right finger [R. 18]. The

---

into a new sort of born-again status because I can't—I can't really endure the society right now in its current format" [R. 63-64].

2

ALJ concluded Mr. Wright didn't have an impairment that met or medically equaled the necessary level of severity as required [R. 18].

In doing so, the ALJ found that Mr. Wright had only moderate limitations in understanding, remembering, or applying information; interacting with others; maintaining concentration, persistence, or pace; and adapting or managing himself [R. 18-19]. He had the residual functional capacity (RFC) to perform work at all exertional levels, but he was limited to understanding, remembering, and carrying out simple and routine tasks [R. 20]. The ALJ determined that Mr. Wright would be able to work as a landscape specialist, a tag stubber, or stone laborer. [R. 25]. The appeals council denied review of the decision, thereby rendering the decision final. Mr. Wright appealed.

## STANDARD

The court has authority to review the appeals council's decision under 42 U.S.C. § 405(g), though review is bound by a strict standard. Because the council denied review, the court evaluates the ALJ's decision as the Commissioner's final word. *See Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). The ALJ's findings, if supported by substantial evidence, are conclusive and nonreviewable. *See Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence is that evidence that "a reasonable mind might accept as adequate to support a conclusion*," Richardson v. Perales*, 402 U.S. 389, 401 (1971), and may well be less than a preponderance of the evidence, *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Richardson*, 402 U.S. at 401). If the ALJ has relied on reasonable evidence and built an "accurate and logical bridge from the evidence to conclusion," the decision must stand. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). Even if "reasonable minds could differ" concerning the ALJ's decision, the court must affirm if the decision has adequate support. *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)).

DISCUSSION

When considering an adult claimant's eligibility for disability benefits, an ALJ must apply the standard five-step analysis: (1) is the claimant currently employed; (2) is the claimant's impairment or combination of impairments severe; (3) do his impairments meet or exceed any of the specific impairments listed that the Secretary acknowledges to be so severe as to be conclusively disabling; (4) if the impairment has not been listed as conclusively disabling, given the claimant's residual function capacity, is the claimant unable to perform his former occupation; (5) is the claimant unable to perform any other work in the national economy given his age, education, and work experience. 20 C.F.R. § 404.1520(a)(4); *Young v. Sec'y of Health & Hum. Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). The claimant bears the burden of proof until step five, when the burden shifts to the Commissioner to prove that the claimant can perform work in the economy. *See Young*, 957 F.2d at 389.

The ALJ concluded that Mr. Wright's clinical signs weren't suggestive of disability before his date of last insured. The ALJ said Mr. Wright was not disabled within the meaning of the Social Security Act. She made this decision after considering Mr. Wright's symptoms, such as his persistent yelling, his prior disability benefits, and his medical history [R. 21-22]. The ALJ found unpersuasive the opinion letter of his treating psychologist, Dr. George Paniotte, because it was written after the relevant time period, was inconsistent with the record, and purported to make a decision reserved for the Commissioner [R. 23]. She also did not find the statements of Mr. Wright's mother credible [*id.*]. Mr. Wright contests these conclusions.

  A. *The ALJ Erred in Evaluating the Opinions of Dr. George Paniotte.*

Dr. Paniotte, a psychiatrist, has treated Mr. Wright since 2011. Mr. Wright argues that the ALJ erred in evaluating the support and consistency of Dr. Paniotte's opinions. An ALJ is required to "explain how [she] considered the supportability and consistency factors" of a treating physician. 20 C.F.R. § 404.1520c(b)(2); *see Rogers v. Saul*, 2021 U.S. Dist. LEXIS 85593, 11 (N.D. Ind. May 5, 2021)

4

(Simon, J.) ("Although the ALJ must consider all of these factors, she need only explain how she considered supportability and consistency."). Failure to do so requires remand. *Tammy M. v. Saul*, 2021 U.S. Dist. LEXIS 112293, 24 (N.D. Ind. June 16, 2021) (Lee, J.).

      1.    *Supportability.*

For a provider's opinion to be supportable, it must be based on "objective medical evidence and supporting explanations." 20 C.F.R. § 404.1520c(c)(1). "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

The date of last insured was December 31, 2017 [R. 128]. Dr. Paniotte's opinion letter was dated July 20, 2018 [R. 475]. In this opinion letter, he noted that Mr. Wright "remains seriously mentally ill" and "completely and permanently disabled and unemployable due to his mental illness" [*id.*]. The ALJ concluded that Dr. Paniotte's opinion was not persuasive because it was written after the date of last insured and was not supported by Dr. Paniotte's medical notes indicating that some part-time shift work might be suitable [R. 23]. Instead, the ALJ found persuasive the opinions of the state agency medical experts who initially considered and then reconsidered his disability claim [R. 23, 121, 129]. In their disability decisions, the state experts noted that Mr. Wright was able to understand, remember, and carry out limited tasks [R. 23, 135-36]. The ALJ did not acknowledge that the state medical experts' opinions were also dated after the date last insured.

Mr. Wright advances two arguments why the ALJ erred in evaluating the supportability of Dr. Paniotte's opinions: (1) the ALJ didn't explain why Dr. Paniotte's opinions were unpersuasive while concluding that the state medical experts' opinions, also rendered after the date of last insured, were persuasive; and (2) the ALJ cherry-picked record evidence to conclude that Dr. Paniotte's statement that Mr. Wright could not work was not supported by Dr. Paniotte's treatment notes. The government

5

responds that the temporal proximity of Dr. Paniotte's medical opinion letter, which was dated after than the opinions of the state medical experts [R. 124, 129], was relevant, but not dispositive, and that Dr. Paniotte's conclusion that Mr. Wright was unable to work was not supported by his medical notes.

When assessing the medical evidence related to Mr. Wright's claim, the ALJ found that Dr. Paniotte's opinions were not persuasive in part because, "[w]hile he is the claimant's psychiatrist and personally treated the claimant for several years, his opinions were written after the claimant's date last insured" [R. 23]. She also noted that his opinion that Mr. Wright was totally disabled and unable to work contradicted Dr. Paniotte's medical record note in which he indicated that Mr. Wright may be able to complete a solitary, isolated work shift if he was able to sleep well [*id.*].

The ALJ is required to articulate the grounds for her decision rationally. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). The ALJ does so by building "an accurate and logical bridge from the evidence to her conclusion." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004). A reviewing court is confined to the agency's actual rationale for its decision, not an after-the-fact justification. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943); *see also Zellweger v. Saul*, 984 F.3d 1251, 1255 (7th Cir. 2021); *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012). On appeal, the "commissioner may not generate a novel basis for the ALJ's determination." *Kastner*, 697 F.3d at 648.

The ALJ didn't explain why the date Dr. Paniotte wrote his opinion letter mattered, particularly for a psychiatrist who treated Mr. Wright for almost a decade. She also didn't explain why the date of authorship rendered this opinion unpersuasive, all the while leaving persuasively in place the opinions of the state medical consultants who reviewed Mr. Wright's past medical records after the fact of his date last insured too. The government argues that this conclusion is justified because the state medical consultants viewed Mr. Wright's records closer to his date of last insured than Dr. Paniotte's letter. But it proves difficult to imagine any sound reason why temporality matters one whit here. If temporal proximity mattered to the persuasiveness of the opinions, the ALJ had to explain why. *See Thelmarae*

6

*W. v. Saul*, 476 F. Supp.3d 717, 724 (N.D. Ill. 2020) ("the court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion"). It is the "ALJ [who] must build an accurate and logical bridge," not the Commissioner's lawyers. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The government's *post hoc* justification as to why the date of the opinion matters is not even hinted in the ALJ's decision, so no logical bridge exists.

Next, Mr. Wright argues that the ALJ erred in analyzing the supportability of Dr. Paniotte's opinion by cherry-picking and mischaracterizing evidence, failing to construct a logical bridge, and committing deep logical errors. These arguments stem from the ALJ's statement that "while [Dr. Paniotte] described the claimant as completely and permanently disabled and unemployable, in his medical records during this time he indicated that a solidarity [sic] isolated shift might work for the claimant if he continued sleeping well" [R. 23].

In Mr. Wright's medical records, Dr. Paniotte noted that Mr. Wright's symptoms meant that "he would have difficulty in a social setting or job situation" [R. 364]. This statement is followed by Dr. Paniotte's hypothesis that "perhaps a solitary isolated shift" could work, which is the phrase the ALJ singles out, but then Dr. Paniotte bookends this hypothetical by discrediting the idea, saying "[b]ut this didn't work-out recently when he tried to work as a midnight-shift janitor at a casino" [*id.*]. The ALJ acknowledged the context of Dr. Paniotte's statement when summarizing Mr. Wright's medical history, but then decried his opinion by cherry-picking the reference to his ability to work a solitary isolated night shift from the statements sandwiching the hypothetical. This was an error. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider all relevant evidence.") (internal quotations omitted).

2.   *Consistency.*

Mr. Wright argues that the ALJ erred when she concluded that Dr. Paniotte's opinion that he is unemployable was not consistent with the record [ECF 14 at 8]. The ALJ based this conclusion on the fact that Mr. Wright volunteers at most once every two weeks with his uncle engaging in manual labor at a local park [R. 23].

For a provider's opinion to be consistent, it must be, reductively, consistent with the record. 20 C.F.R. § 404.1520c(c)(1). "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1). Thus, an ALJ must discuss how the providing physician's statements are either consistent or inconsistent with the other evidence in the administrative record.

The ALJ discredited Dr. Paniotte's opinion by noting that Mr. Wright left his job at the casino because of cigarette smoke and not his impairments [ECF 22]. This finding again is based on a selective reading of Mr. Wright's testimony and his disability report, in which he explicitly stated that he left his job at the casino because of smoke, his manic symptoms, and difficulty with socialization [R. 50, 227]. In finding Dr. Paniotte not persuasive, the ALJ had to again select certain lines between other statements that provide critical context to the doctor's conclusion, while disregarding the remaining evidence presented by Mr. Wright about why he left his casino job. The ALJ did not adequately describe Dr. Paniotte's opinion's consistency with the record before concluding his opinion was inconsistent. This is error.

Mr. Wright further argues that the ALJ erred by using his volunteer work to speculate and further discredit Dr. Paniotte's opinion about his ability to work. Dr. Paniotte's opinion included the statement that Mr. Wright "remains completely and permanently . . . unemployable due to his mental illness" [R. 475]. The ALJ said Dr. Paniotte's "report that the claimant was unemployable seems

8

inconsistent with the voluntary work that the claimant performs" [R. 23]. At first blush, it may seem intuitive that performing volunteer work would be contrary to being completely unemployable, but the law has emphasized the numerous differences between volunteer work and a job. *See Thaddeus v. Saul*, 2020 U.S. Dist. LEXIS 166563, 17 (N.D. Ind. Sep. 11, 2020) (Lee, J.) ("Clearly volunteer work is not the same as full-time employment and cannot be equated to the ability to work full-time."). For example, a volunteer applicant is unlikely to be rejected, whereas a job applicant can easily be rejected. Volunteers can often create their own hours, volunteer as little as they want based on their own capacity and can stop or start volunteering at will. Employees are not entitled to these same liberties. *See Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010) ("there is a significant difference between being able to work a few hours a week and having the capacity to work full time"). What would seem to matter is the quality and consistency of that work, perhaps among other factors.

Mr. Wright testified that he volunteers with his uncle for a few hours about twice a week at Wolf Lake Park, doing things like putting up mesh wire [R. 47]. The ALJ, while acknowledging that he is able to cooperate with others while volunteering, didn't consider the impact of his uncle's presence on these interactions or that the interactions were limited to his uncle [*see* R. 395]. The ALJ further didn't explain how a few hours of volunteer work equates to being able to hold down gainful employment. There is no logical bridge that links the ALJ's conclusion that the volunteer work renders Dr. Paniotte's opinion inconsistent with the record. By not describing the applicability of his occasional family-supervised volunteer activities to greater conclusions about Mr. Wright's ability to work, the court cannot "trace the path of the ALJ's reasoning from evidence to conclusion." *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015).

According to Dr. Paniotte, Mr. Wright experiences tangential thought processes, difficulty focusing, challenged and impulsive judgement, hypomanic symptoms, and hypo-verbosity [R. 475]. Dr. Paniotte also found that Mr. Wright is prone to slip into psychotic manifestations, self-isolates,

9

and has monotone speech that is stilted formal and devoid of emotion [R. 370, 475]. Finally, Dr. Paniotte's opinion letter also included the statement that Mr. Wright "remains completely and permanently disabled . . . due to his mental illness" [R. 475]. The ALJ notes that such a disability decision is reserved to the Commissioner [R. 23]. The ALJ (and the government in briefing) is correct that ultimate disability conclusions are reserved to the Commissioner, and thus neither valuable nor persuasive when proffered by a third-party. 20 C.F.R. § 404.1520b(c)(3). Yet, the ALJ does not explain why Dr. Paniotte's overstep into the realm of the Commissioner renders his medical opinions about Mr. Wright's conditions and the weighty limitations they place on Mr. Wright's functioning inconsistent with the record as a whole. *See Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) ("Although a written evaluation of each piece of evidence or testimony is not required . . . neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion."). Such statements are just as easily excised.

The ALJ, in using Dr. Paniotte's postulation and Mr. Wright's volunteer activities to conclude Dr. Paniotte's opinions were inconsistent, and thus not persuasive, did not meaningfully engage with Dr. Paniotte's conclusions about Mr. Wright's significant mental illness—conclusions curated after a nearly decade-long provider relationship. The duration of this relationship was acknowledged by the ALJ, but the consistency finding was nonetheless based a postulation about isolated shift work, Mr. Wright's volunteer activities, and the statement that he was permanently disabled. *See Stephens v. Berryhill*, 888 F.3d 323 (7th Cir. 2018) (the ALJ "may not select only that evidence that favors [her] ultimate conclusion"). Though the ALJ is not required to mention every piece of evidence in the record, the ALJ cannot ignore entire lines of contrary evidence, such as Dr. Paniotte's numerous medical notes detailing Mr. Wright's psychotic symptoms and noting his inability to work, without explaining why. *See Craft*, 539 F.3d at 673; *see also Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012).

Finally, Mr. Wright argues that the ALJ did not assess the regulatory factors when weighing Dr. Paniotte's opinion. Mr. Wright argues that the ALJ was required to consider the length of the treatment relationship, frequency of the treatment, purpose of treatment relationship, extent of treatment relationship, and Dr. Paniotte's specialization. The ALJ must consider these factors, and indeed she acknowledges that Dr. Paniotte is a psychiatrist and has a long treatment relationship with Mr. Wright [R. 23], but she is only required to describe the consistency and supportability of the provider's opinion. *See* 20 C.F.R. § 404.1520c(b)(2); *Rogers*, 2021 U.S. Dist. LEXIS 85593 at 11. Thus, the ALJ's lack of specificity in describing all the other factors is not error.

Nevertheless, because the ALJ did not adequately explain how she reached the conclusions she reached about the supportability and consistency of Dr. Paniotte's opinions, and only selected certain that was favorable to her conclusion, she did not build a logical bridge. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("[W]e cannot uphold a decision…if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge."). Therefore, the ALJ did not "explain her decision in such a way that allows us to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2004). As such, remand is required.

B.   *Symptom Assessment under SSR 16-3P.*

Mr. Wright's next series of arguments are all linked to SSR 16-3P, a social security ruling elaborating on how symptoms are to be evaluated in disability claims. *Soc. Sec. Rul. 16-3p Titles II and XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3P (Oct. 25, 2017).[2] Mr. Wright argues that the

---

[2] SSRs do not carry the force of law but are binding on all components of the Social Security Administration. 20 C.F.R. § 402.35(b)(1).

11

ALJ erred in evaluating his prior disability benefits, his medical compliance, his need to yell out, and finally in excluding the statements of a third party.

        1.    *Prior Disability Benefits and History of Medical Treatment.*

Mr. Wright argues that the ALJ erred in evaluating his prior disability benefits by stating that he was previously removed from disability benefits because his condition improved, thereby implying that his previous condition is a benchmark for eligibility. The government responds that the ALJ did not base her conclusion on the discontinuation of prior benefits, and rather that "the ALJ provided a detailed and thorough summary of Plaintiff's mental health treatment history, including evidence outside the relevant period" [ECF 15 at 10]. The government further argues that Mr. Wright takes the ALJ's discussion of his past eligibility out of context [ECF 15 at 11].

Findings produced by the ALJ are binding but not if they are based on errors of fact or logic. *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). The ALJ's findings must be based on substantial evidence, and that evidence requires elaboration on the part of the ALJ to show how the evidence was assessed to support the conclusion. *See Zurawksi v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The ALJ cannot speculate if there is no evidence to support that speculation, and "a decision based on speculation is not supported by substantial evidence." *White ex rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999).

When assessing the ability to work, any alleged improvement does not necessarily indicate that the individual is capable of working full-time, *see Murphy*, 759 F.3d at 819, and evidence must be presented that any relief from symptoms was substantial enough to show that the individual is capable of gainful employment, *see, e.g.*, *Allensworth v. Colvin*, 814 F.3d 831, 835 (7th Cir. 2016). This notion stems from 20 C.F.R. § 404.1594(a), which requires the ALJ to determine if there has been any improvement in the individual's condition, and whether that improvement is related to the individual's ability to work.

The ALJ found that Mr. Wright was removed from benefits due to improvement; but, upon review of the hearing testimony and record, the exact reasons for Mr. Wright's prior removal prove unclear. The ALJ stated that:

> [T]he claimant's medical records do not fully support disability before his date last insured. The claimant was previously approved for disability benefits but was subsequently found to have improved. The claimants medical record shows some level of relapse since, but the record does not indicate that he is as limited as he was when he was approved for disability benefits [R. 21-22].

However, during the hearing Mr. Wright testified that "they abruptly removed me from disability without an adequate explanation as to why" [R. 53] and then later explained that Social Security wanted him to see a different provider and he refused [R. 59].

Nevertheless, the ALJ noted that his relapsing symptoms were not as limiting as when he was previously on disability and went on to compare his past symptoms to his present symptoms, including no recent suicidal thoughts or attempts [R. 22]. Coupled with the statement that Mr. Wright was previously removed from disability because he "was subsequently found to have improved" [R. 21-22], the implication of this comparison is that his previous symptoms are a threshold for eligibility because if the reason he was removed from the program was because he got better, and he is better now than he was before, he must be well enough to work.

But the record is not clear as to why Mr. Wright was previously removed from disability. Although Mr. Wright's condition has improved to a certain degree relative to his past symptoms, this improvement does not allow for the inference that he is not eligible for benefits, at least not without an explanation supported by substantial evidence. *See Murphy*, 759 F.3d at 819 ("simply because one is characterized as 'stable' or 'improving' does not necessarily mean she is capable of doing light work"). The ALJ's treatment history summary leaves an insufficient factual or logical basis for her conclusion. *See, e.g.*, *Zurawski*, 245 F.3d at 887; *Murphy*, 759 F.3d at 819. This requires remand.

      2.    *Medical Compliance.*

Mr. Wright next argues that the ALJ erred in evaluating his prior medical compliance, specifically his compliance with taking his medications as prescribed, claiming that the ALJ was required to evaluate explanations as to why Mr. Wright failed to take his medication [ECF 14 at 14-15]. The government responds that the ALJ properly evaluated how his medication compliance related to his symptoms, that Mr. Wright failed to show how an investigation into his non-compliance would have impacted the outcome, and that remand on this issue is not warranted as the record is not clear about his compliance [ECF 15 at 11-12].

Mental illnesses (such as bipolar disorder) may prevent the sufferer from taking prescribed medications. *See Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006). When an ALJ doesn't consider the possibility that a plaintiff's mental illnesses make it difficult to comply with treatment recommendations, it is error. *Pulley v. Berryhill*, 295 F. Supp.3d 899, 901-902 (N.D. Ill. 2018). Remand is not required however "unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989). Such an error does not necessitate remand when the discussion of noncompliance is not crystal clear or does not weigh against the credibility of the claimant's symptoms. *See Lothridge v. Saul*, 984 F.3d 1227, 1235 (7th Cir. 2021).

The ALJ found that "the claimant was also only taking half his medication at night sometimes for reasons that are not clear, as he has no side effects" [R. 22]. There is no mention of how this factor weighed into the conclusions drawn or the credibility of Mr. Wright. Thus, there is no indication that this statement of non-compliance was used as evidence against the severity of Mr. Wright's symptoms. As the impact of the ALJ's statement is unclear, the court finds no error. *See Lothridge*, 984 F.3d at 1235 (a statement of non-compliance that did not draw negative inferences about the claimant's symptoms is not error); *Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) (remanding when medication non-compliance was used to discredit claimant's symptoms).

3. *Yell Out.*

Mr. Wright argues that the ALJ erred in evaluating his need to yell out and didn't include a limitation in the RFC assessment and hypothetical question to the vocational expert on the topic. [ECF 14 at 15-16]. Conversely, the government argues that the ALJ's summary accurately tracked the treatment notes, that Mr. Wright did not met his burden to establish what other specific limitations were needed regarding his yelling, and finally that the RFC assessment nevertheless included detailed limitations that encompassed this need [ECF 15 at 13].

An administrative decision cannot be upheld if it fails to mention highly pertinent evidence or if the decision fails to build a logical bridge between the facts and the outcome. *Parker*, 597 F.3d at 921. It is not adequate to merely recite the medical record when explaining an outcome or building a logical bridge. *Craft*, 539 F.3d at 677. The ALJ must analyze and articulate how she weighed the evidence, building a logical bridge stemming from the facts to support her conclusions. *See id.* The ALJ acknowledged that despite Mr. Wright's medical noncompliance, he only needs to yell out once or twice every couple of days [R. 22]. Then the ALJ looked to the vocational expert's guidance to assess what limitations may be appropriate in light of this need.

An ALJ must ensure that the vocational expert's assessment accounts for the necessary limitations. *See, e.g., Sims v. Barnhart*, 309 F.3d 424, 432 (7th Cir. 2002). Generally, the ALJ must orient the vocational expert to the totality of a claimant's limitations, but there is no *per se* requirement that specific terminology (such as concentration, persistence, pace) be used in the hypotheticals in all cases. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). A court is able to assume that the vocational expert is familiar with the claimant's overall limitations when he or she independently reviewed the medical record or heard testimony directly addressing certain limitations. *Id.*

But this "the general rule, however, does not apply where, as here, the ALJ poses a series of increasingly restrictive hypotheticals to the [vocational expert], because in such cases [a court] infer[s]

15

that the [vocational expert]'s attention is focused on the hypotheticals and not on the record." *Id.* A court must analyze whether the vocational expert's inquiry accounted for the totality of a claimant's limitations, considering whether the vocational expert independently reviewed the medical record, heard direct testimony, and whether the vocational expert was posed a series of increasingly restrictive hypotheticals. *See id.* Additionally, it is the plaintiff's burden to suggest additional limitations that would be required to address capacity, and to provide evidence that supports specific limitations affecting capacity to work. *See Weaver v. Berryhill*, 746 Fed. Appx. 574, 579 (7th Cir. 2018).

The ALJ restricted the vocational expert's focus during the hearing to a hypothetical person who "is limited to no more than occasional interaction with the public, coworkers, and supervisors" [R. 80]. The vocational expert was present during Mr. Wright's testimony when he stated, "I'm always, maybe five times a day, yelling or doing outbursts" and described his difficulties with socialization [R. 29, 50, 60]. Thus, the limitation provided to the vocational expert by the ALJ reasonably encompassed the need to yell out as a reason to limit social interactions as it pertained to a hypothetical individual with Mr. Wright's social limitations. Though the ALJ posed several hypotheticals to the vocational expert, they were not so overly restrictive as to preclude consideration of yelling out. And indeed, the ALJ's ultimate finding included a limitation that sufficiently encompassed Mr. Wright's need to limit social interaction, in part because of his need to yell out [R. 20]. Further, Mr. Wright has not suggested what other specific limitation he would require in light of his compulsion, besides a finding of not being able to work, despite it being his burden to do so. *See Weaver*, 746 Fed. Appx. at 579. Thus, the ALJ did not err when she instructed the vocational expert on a hypothetical limitation which reasonably could encompass Mr. Wright's social limitations.

    4.    *Assessment of Third-Party Statements of Mr. Wright's Mother.*

Finally, Mr. Wright argues that the ALJ erred in assessing the third-party statements of Mr. Wright's mother, Lara Maryianowski. Mr. Wright argues that third-party witnesses do not require a

professional degree, *see Dunn v. Saul*, 794 F. Appx. 519, 523 (7th Cir. 2019), and that the ALJ was required to address "non-medical source" opinions, *see* 20 C.F.R. § 416.913(a)(4) [ECF 14 at 16-17]. In contrast, the government argues that the ALJ was not required to articulate how she considered evidence from nonmedical sources [ECF 15 at 13-14]. *See* 20 C.F.R. § 404.1520c(d).

Per 20 C.F.R. § 404.1520c(d), the ALJ is not "required to articulate how [she] considered evidence from nonmedical sources." The ALJ is not tasked with "considering the consistency of a non-medical source's personal observations with the claimant's statements and the evidence in the file." *Lindsey v. Saul*, 2021 U.S. Dist. LEXIS 35221, 4 (E.D. Wis. Feb 25, 2021). She need only "minimally articulate [her] reasons for crediting or rejecting evidence of disability." *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992).

The ALJ considered the evidence submitted by Mr. Wright's mother, but nonetheless concluded her opinions on the degree, frequency, and duration of Mr. Wright's medical needs were not impartial and were inconsistent with the balance of the record evidence [R. 22]. This finding satisfies the minimal articulation of why the ALJ did not credit her statements. *See Scivally*, 966 F.2d at 1076. Therefore, there was no error in the assessment of the third-party statements of Ms. Maryianowski.

## CONCLUSION

Although the arguments advanced on appeal don't in each instance demonstrate an error, errors did occur that require remand. Accordingly, the court GRANTS Mr. Wright's request for remand and REMANDS the Commissioner's decision in light of this opinion.

SO ORDERED.

September 21, 2021                             *s/ Damon R. Leichty*
                                                Judge, United States District Court